FILED

IN THE UNITED STATES DISTRICT COURT 15 JUN 12 AM II: 16
FOR THE MIDDLE DISTRICT OF FLORIDA CLERK
FT. MYERS DIVISION    MIDDLE DISTRICT FLORIDA
FT. MYERS, FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* | ) | |
| | ) | |
| CHRISTINE H. OHA | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | **2: 15 -CV- 350 -FtM- 29CM** |
| | ) | |
| v. | ) | FILED IN CAMERA |
| | ) | AND UNDER SEAL |
| ADVANCED PAIN MANAGEMENT & SPINE | ) | |
| SPECIALISTS OF CAPE CORAL AND FT. | ) | FALSE CLAIMS ACT |
| MYERS, DR. MICHAEL E. FREY, DR. | ) | COMPLAINT AND DEMAND |
| JONATHAN S. DAITCH,  PARK CENTER FOR | ) | FOR JURY TRIAL |
| PROCEDURES, LLC, INSYS THERAPEUTICS, | ) | |
| INC. (SUBSYS), NEUROTHERM, INC., | ) | |
| MEDTRONIC, INC., JAZZ | ) | |
| PHARMACEUTICALS, INC., ALLERGAN, | ) | |
| INC., DEPOMED, INC., A&G SPINAL | ) | |
| SOLUTIONS, INC., IPS OF FT. MYERS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT AND PENDANT STATE CLAIMS

The *qui tam* relator, Christine H. Oha, on behalf of the United States Government and the State of Florida, brings this action for violations of the Federal False Claims Act and the Florida False Claims Act to recover damages, civil penalties, based on her personal knowledge and that of her attorneys, and alleges:

1.      Relator Christine Oha brings this *qui tam* action against the Defendants for knowingly defrauding the federal and state governments in connection with Medicare, Medicaid and other federal and state health programs.

2.     Advanced Pain Management & Spine Specialists of Cape Coral and Ft. Myers ("Advanced Pain,") operates from Suite 200 at 8255 College Parkway in Ft. Myers. Nearby in Suite 100 is the Park Center for Procedures, an outpatient clinic that inflicts unnecessary procedures on vulnerable patients, whose doctors engage in large-scale self-referral in violation of the Stark Act, and whose owners regularly accept kickbacks from vendors in violation of the federal Antikickback Act.

3.     To conceal their actions and to obtain the benefit of their false claims, the Pain Center falsely certified to the federal and state governments that their services in their claims for reimbursement complied with federal law, including the prohibitions against illegal remuneration to physicians, kickbacks, improper remuneration to physicians and fraudulent or unnecessary services.

4.     Through these acts as described in detail below, the Defendants knowingly caused the submission of False Claims to the United States and the State of Florida.

## PARTIES

5.      Relator Christine H. Oha a resident of the State of Florida worked at Pain Center as a Nurse Anesthetist from January 2012. Initially she worked intermittently but in January 2013, she began working regularly there on a part-time basis. In June 2013, she began working full-time. She directly observed the actions alleged in this Complaint.

6.     The United States is a party to this action on behalf of the U.S. Department of Health and Human Services and the Centers for Medicare and Medicaid ("CMS").

7.     The state of Florida is a party to this action.

8.      Defendant Advanced Pain is incorporated in Florida and operates in Fort Myers, Florida.

9.      Defendant Park Center for Procedures is a business owned by Defendants Michael Frey and Jonathan Daitch, incorporated in Florida and operating in Fort Myers, Florida.

10.     Defendant INSYS Therapeutics, Inc. is a Chandler, AZ corporation, incorporated and operating in Arizona. Insys is the manufacturer of Subsys, a highly potent pain medication intended by the FDA to be used only for terminal cancer patients.

11.     Defendant Neurotherm  Inc. is a Wilmington, Mass., corporation, incorporated and operating in the Commonwealth of Massachusetts.  Neurotherm manufactures spinal surgery products.

12.     Defendant Medtronic, Inc. is a Danvers, Mass. corporation, incorporated and operating in the Commonwealth of Massachusetts. Medtronic manufactures medical supplies and equipment such as Medtronic spinal cord stimulators.

13.     Defendant Jazz Pharmaceuticals, Inc. is a company headquartered in Dublin, Ireland, with offices in Palo Alto, California and Philadelphia, Pennsylvania. Jazz manufactures Prialt, a pain medication.

14.     Defendant Allergan, Inc. is an Irvine, California corporation, incorporated and operating in California.  Allergan is the manufacturer of Botox.

15.     Defendant Depomed is a Newark, California corporation, incorporated and operating in California.  Depomed manufactures pain medication.

16.  Defendant Michael E. Frey is a physician licensed in the state of Florida.  He is an owner, in whole or in part, of the following businesses, none of which are defendants at this time:

- Advanced Pain Management Specialists, P. A., Park Center for Procedures LLC, Park Central LLC, Park Center Condominium Association Inc., Friday LLC, TGIP LLC, Arfrey LLC., IPS of Ft. Myers, LLC, Anesthesia Partners of Southwest Florida LLC, Advanced Laboratories of SW Florida LLC, Surgical Spine Associates LLC, Frey Investments LLC, Frey Investments LLC.

17.  Defendant Jonathan S. Daitch is a physician licensed in the state of Florida.  He is an owner, in whole or in part, of the following businesses:

- Advanced Pain Management Specialists, P. A., Park Center for Procedures LLC, Park Central LLC, Park Center Condominium Association Inc., Friday LLC,  TGIP LLC, APMS Assets LLC, IPS of Ft. Myers LLC, Anesthesia Partners of SW FL LLC,  Advanced Laboratories of SW FL LLC, Surgical Spine Associates LLC, PCP Management LLC.

## JURISDICTION AND VENUE

18.  The District's jurisdiction is predicated on 31 U.S.C.  § 3729, *et seq.*, specifically, §§ 3732(a) and (b), 1331 and 1345, which specifically confer jurisdiction on this Court. There have been no statutorily-relevant public disclosures of the "allegations or transactions" described in this Complaint. Ms. Oha is an original source.

19.  Venue is appropriate in the Middle District of Florida under 31 U.S.C. § 1332(a)  and sufficient contacts exist for jurisdiction because the Defendants conduct business within the District.

20.   At all times material, the Defendants transacted business within this District.

## LEGAL BACKGROUND

### The Stark Act

21.   The Stark Act is a section of the Social Security Act, 41 U.S.C. §1395nn. It prohibits a healthcare business from submitting claims for Medicare payment based on patient referrals from physicians having an "improper relationship" with the healthcare business, as defined in that statute. The regulations implementing the Stark Act require that any payments received in violation of the Stark Act must be refunded on a timely basis. 42 C.F.R. § 411.353.

22.   Congress enacted the Stark Act in two parts. Stark I applies to Medicare coverage of clinical laboratory referrals made by physicians with an improper relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, Pub. Law 109-239, § 6204.

23.   In 1993, Congress expanded the Stark Act to apply to additional health services. See Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562; Social Security Act Amendments of 1994, Pub. 103-42, § 10352. Stark II applies to: physical therapy, occupational therapy, radiology, radiation therapy and services, durable medical equipment and supplies, parenteral and enteral nutrient equipment and supplies, prosthetics, orthotics and prosthetic devices, and home health services. *See* § 395nn(h)(6).

24.   If a physician has a financial relationship with a healthcare organization that provides these services, then the physician may not make a referral to that organization and

5

may not present a claim, or cause a claim to be presented, for payment for any of these services. § 1395nn(a)(1).

25. The Stark Act broadly defines direct or indirect compensation paid to a referring physician and carves out exceptions that are not applicable to the claims alleged here.

### The Medicare and Medicaid Anti-Kickback Statute

26. The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The so-called Anti Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to over utilization or poor quality of care.

27. The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.42 U.S.C. § 1320a-7b(b). The Statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes inducement of a physician to refer patients for services that will be reimbursed by a federal health care program.  The Statute ascribes liability to both bidder and the recipient of the bribe.

28.   The Anti-Kickback Statute exempts certain transactions from its prohibitions. These exceptions include regulatory safe harbors for space rental, equipment rental, personal services and management contracts and certain *de minimis* gifts, as long as certain standards are met. Those exceptions do not apply to the allegations in this Complaint.

29.   Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

30.   Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.

31.   Either pursuant to provider agreements, claims forms, or other appropriate manner, clinics and physicians who participate in a federal health care programs must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.  Those who falsely make such certifications face liability under the federal and Florida false claims acts.

32.   Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.42 U.S.C. § 1320a-7(a)(1).

33.   The enactment of these acts demonstrates Congress's commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks. Thus, compliance with the Stark and Anti-Kickback statutes is a prerequisite to a

provider's right to receive or retain reimbursement payments from Medicare and other federal health care programs.

### The Medicare and Medicaid Programs

### Medicare

34.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program. Medicare is a federally-funded health insurance program primarily benefiting the elderly. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. § 426 et seq.

35.    Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare pays providers only for services that it considers are reasonable and necessary for the diagnosis or treatment of illness or injury. *See* Social Security Act § 1862(a)(1)(A).

36.    Providers who wish to participate in the Medicare program must ensure, among other things, that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

37.    The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

38.    As detailed below, the Defendants submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

39. As a prerequisite to payment for Medicare, CMS requires physicians and their professional organizations to submit an enrollment form CMS-8551. Each of these forms contains a "Certification" that must be signed by the physician that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or [my] organization. I understand that payment of a claim is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Antikickback statute and the Stark law) and on the supplier's compliance with all applicable conditions of participation in Medicare.

40. A physician must also submit Form CMS-1500, certifying that the treatment or procedure is medically necessary.

41. Each physician that participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Medicaid requirements, including the fraud and abuse provisions.

42. TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

43. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

44. Compliance with the Stark and the Anti Kickback statutes is also a condition for participation in the TRICARE/CHAMPUS and FEHB programs. Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were

the result of referrals tainted by kickbacks or violations of Stark, are false claims and are not entitled to reimbursement.

45.     Pursuant to the terms of the Medicare Provider Agreement, the Defendants certified that the claims they submitted were eligible for Medicare and Medicaid payment and that the providers had complied with the statutes and regulations relating to Medicare and Medicaid.

46.     Because claims that derive from referrals that were tainted by kickbacks or that violate the Stark laws were not eligible for reimbursement, submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729. And, those who knowingly cause such false or fraudulent claims to be filed, as the Defendants have done here, are liable under the federal False Claims Act, 31 U.S.C. § 3729.

47.     Because they signed these Medicare and Medicaid forms, the Defendants knew that claims that derived from referrals that were tainted by kickbacks, are unnecessary procedures, or that violate the Stark laws are not eligible for federal or state reimbursement.

48.     The Defendants undertook their fraudulent schemes of inducing or taking   kickbacks from vendors, unnecessary procedures and self-referrals through improper financial relationships and then submitting claims for reimbursements for services provided as a consequence of referrals tainted by illegal kickbacks or other improper financial compensation. Every claim for reimbursement derived tainted by an illegal kickback, self-referral or other unlawful compensation is a false or fraudulent claim for payment under 31 U.S.C. § 3729.

## FACTUAL ALLEGATIONS

## UNNECESSARY PROCEDURES

### Unnecessary Anesthesia

49.   Anesthesia has the potential to induce physiological changes that can lead to morbidity and mortality. As a result, it is commonly regarded as a high-risk activity. Leandro Gobbo Braz, Danilo Gobbo Braz and José Reinaldo Cerqueira Braz, *Mortality in Anesthesia: A Systematic Review,* Clinics (Oct. 2009).

50.   The American Society of Anesthesiologists has stated that "It is the opinion of the Committee that the majority of minor pain procedures, under most routine circumstances, does not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections. The use of general anesthesia for routine pain procedures is warranted only in unusual circumstances."

51.   Routine sedation is not required for patients receiving spinal injections. Kim N, Delport E, Cucuzzella T, Marley J, Pruitt C. *Is Sedation Indicated Before Spinal Injections* (Spine 2007). Nevertheless, unnecessary anesthesia adds more than $1 billion a year in wasteful healthcare spending. Liu H, Waxman DA, Main R, and Mattke S, *Utilization of Anesthesia Services During Outpatient Endoscopies and Colonoscopies and Associated Spending in 2003–2009,* Journal of the American Medical Association, Vol. 307, No. 11, March 21, 2012, pp. 1178–1184.

52.   Because it is medically unnecessary, Medicare will not pay for an anesthesiologist or nurse anesthetist in most routine pain procedures. See http://www.cms.gov/medicare-

coverage-database/license/cpt-license.aspx?from=~/overview-and-quick-search.aspx&npage=/medicare-coverage-database/details/lcd-details.aspx&LCDId=30570&ver=6&ContrId=197&ContrVer=1.  CMS states that Monitored Anesthesia Care ("MAC") is to be billed to Medicare only in exceptional circumstances, and general anesthesia should only be used in even rarer instances.

53.   At Advanced Pain, however, the use of a Nurse Anesthetist to provide MAC and general anesthesia is a routine and nearly universal practice, even for patients who come to the clinic for minor procedures, such as spinal and joint injections.

54.   Instead of administering MAC under exceptional conditions as Medicare requires, the Pain Center's anesthesia company, IPS of Ft. Myers LLC, routinely bills for general anesthesia. The patient consent form makes clear that anesthesia is a healthcare service patients must actively opt-out from.  (See Exhibit A).  These patient consent forms require patients to sign that they "understand that anesthesia services are needed so that my doctor can perform the operation or procedure."

55.   This, however, is not true.  In fact, most of the patients do not need MAC or general anesthesia at all, nor do they require the service and additional cost of an anesthesia provider. MAC is required only in exceptional circumstances.

56.   Advanced Pain skirts the Medicare restriction by administering propofol, a highly potent sedative that, at a sufficiently high level, acts as a general anesthetic.

57.   As a result, IPS of Ft. Myers routinely bills Medicare over $1,000 for these general anesthesia procedures, while most patients only require local anesthesia or the administration of a light sedative, which should only be billed at a level of about  100.

Because they owned 49 percent of IPS, Drs. Frey and Daitch, in turn, reaped much of the benefit of the scheme.

58.    As a result, Advanced Pain has put most of their patients at unnecessary risk and caused Medicare to pay for wasteful procedures.

59.    For example, on February 13, 2014, Patient "D.J.A.," a 57-year-old male, came to Advanced Pain for a nerve root injection. Just before the procedure was to begin, however, the patient became nervous and asked for a tranquilizer to relax him. He asked that he not be given anesthesia, but instead wanted "just something to take the edge off." Dr. Frey ordered anesthesia and the Nurse Anesthetist, Ms. Oha, gave Versed, a tranquilizer that costs less than $1.00. Dr. Frey said: "Oh, so now we are billing anesthesia for some Versed." As a result, Medicare was billed for monitored anesthesia care at a rate of about $100, instead of no charge at all.

60.    Again, on April 16, 2014, a 65 year old woman, "K.S.," came to the clinic for a bilateral sacroiliac joint injection. For this procedure, Dr. Frey ordered anesthesia services, and the patient received general anesthesia. As a result, IPS of Ft. Myers submitted a bill to Medicare for more than $1,000 for the costs of the anesthesia.

61.    On April 16, 2014, a 70 year old woman, "M.S." came to the clinic for a bilateral sacroiliac joint injection. For this procedure, Dr. Frey ordered anesthesia services, and the patient received general anesthesia.

62.    On April 17, 2014, a 72 year old woman, "J.K.," was to have a nerve root injection in the L4 and L5 lumbar area of her vertebra. For this procedure, Dr. Frey ordered anesthesia services and the patient received general anesthesia.

63.  On April 17, 2014, a 71 year old woman, "K.U.," was to have a bilateral sacroiliac joint injection.   For this procedure, Dr Frey ordered anesthesia services and the patient received general anesthesia.

64.  On February 13, 2014, a 66-year old man came to the clinic for a nerve root injection to a lower vertebra.  For this procedure, Dr. Frey ordered anesthesia services and the patient received general anesthesia.

65.  On August 6, 2013, Dr. Frey told Ms. Oha: "I never thought that I would ever do an intercostals block with anesthesia. I should have just told him [the patient] he didn't need it."

66.  Advanced Pain performed about 6,000 anesthesia procedures in 2013.   About 46 percent of these patients were on Medicare or Tricare.

### Unnecessary Home Healthcare and Further Stark Act Violations

67.  To qualify for home healthcare coverage paid by Medicare, a patient must be certified by a physician that the patient either requires assistance to leave home or have a condition for which leaving the home is contraindicated.  CMS Ch. 7, § 30.1.1. Even then, Medicare also requires that the patient have a normal inability to leave the home and that leaving home requires a considerable and taxing effort. *Id.*

68.  Despite these restrictions, Dr. Frey routinely refers patients to the Doctor's Choice Home Health Agency, where Dr. Frey serves as medical director. He does this even for patients who cannot possibly be considered homebound. Most of the patients are enrolled in Medicare, and Medicare is billed accordingly for the home health care. Home healthcare has a five-visit minimum, and Dr. Frey receives $250 per referral. All of the examples given below are documented in Ms. Oha's records. A registered

nurse at the Pain Center, Carole Gowing, informed Ms. Oha that, contrary to Medicare requirements, none of the home healthcare patients are offered a choice in the home health agency they use.

69.     For example, on August 16, 2013, a patient came to the Pain Center with a headache that stemmed from his neck. After treatment, he walked out of the building, but was referred to the DCHHA.

70.     On August 19, 2013, a patient was referred to DCHHA. After the patient left the Pain Center, he told Oha, he was going drive to himself to Tampa the next day.

71.     On December 2, 2013, a patient who drove himself to the Pain Center was referred to DCHHA.

72.     On May 5, 2014, a Pain Center patient was referred to DCHHA, even though she was ambulatory. In fact, she told Oha that she was going to sail her sailboat back to New York in two weeks.

73.     On May 8, 2014, Dr. Frey ordered Ms. Oha not to give any pain medication during the patient's entire procedure. After the procedure, he ordered DCHHA for post-op pain management.

74.     On April 23, 2014, Dr. Frey made a referral of a 44-year-old male, "M.J.K.," even though he came to the clinic with nothing more than a routine nerve root injection.

## KICKBACKS

### Medtronic

75.     Pain Center conducts trials with Medtronic spinal cord stimulators and makes significant purchases from Medtronic, Inc., several times a year for patients at a cost of about $60,000 per device. These are usually paid by Medicare or

15

CHAMPUS/TRICARE. Medtronic also sells its Synchromed II Infusion System. This medication pump is used for continuous infusions of Prialt, a drug also used by Drs. Daitch and Frey for trials. As explained below, Medtronic gets this business by giving Pain Center kickbacks in the form of lavish gifts.

76.    Drs. Daitch and Frey held a "Casino Night" on March 7, 2014 as an appreciation to all the doctors who are referring patients to the Pain Center. The event required gifts and prizes, but Daitch and Frey had no intention of paying for it all themselves.

77.    At about 6 p.m. on February 28, 2014, Oha and Krista Samuelson, a registered nurse, heard Dr. Daitch on the telephone, saying that Drs. Daitch and Frey had "asked their vendors to donate for the casino night."

78.    At the Casino Night, Alex Barrios, an employee at Advanced Pain, won a Vivo plasma television set donated by Medtronic. Krista Samuelson told Ms. Oha that Mr. Barrios received an invitation because his wife Nicole Green Barrios was one of the Medtronic sales repreentatives. Ms Samuelson said that Medtronic usually donates gifts for these events.

79.    Allergan also donated gifts constituting kickbacks to the Casino Night. On February 20, 2013, Jodi Kuhl, the sales representative for Botox, visited the Pain Center and stopped by the office's breakroom, visibly upset. Ms. Oha was in the breakroom and Ms. Kuhl started to vent. She told her that Dr. Daitch had sent her an email requesting that she sponsor food on the Casino Night. She knew that it was not allowed and did not want to lose her job. She said her husband was at liberty to donate because he was a partner in a law firm independent of Allergan. "They are making so much money," she complained. "Can't they buy their own food?"

80. Similarly, at a party Advanced Pain threw for its employees in December 2012, Connie Hamrick, Medtronic sales rep, told Ms Samuelson that Medtronic had donated about 80 percent of the prizes, including an iPad and other lavish gifts.

### Neurotherm

81. Each year, Dr. Frey conducts approximately 100 vertebroplasties, and Dr. Daitch conducts a significant number of these procedures as well. Vertebroplasties are procedures to relieve chronic pain caused by vertrebral compression fractures. In the procedure, the doctor drills a hole in the vertebra and injects bone cement. Neurotherm sells a product, the Neurotherm Parallax Vertebral Balloon, that inflates into this hole, allowing a doctor to inject the bone cement more easily.   These balloons are billed to Medicare for about $1,000 each.

82. Neurotherm markets these balloons by offering clinics a kickback.   If a doctor uses two of these balloons a month, Neurotherm provides the doctor a $200 discount on purchases of its NeuroTherm Acrylic Resin with TRACERS Bone Cement and EZFlow® Cement Delivery System, products that are also used in these procedures.

83. On January 31, 2014, Dr. Frey was in the clinic's procedure room conducting a vertebroplasty on a patient.   To the four staffers in the room, Dr. Frey said he was considering whether to use a balloon.   The x-ray tech Alex Barrios replied, "Well, you don't have to, because you have already used your two this month. Isn't that what the deal was, to get the $200 off?" Dr. Frey answered, "that's correct, so I don't have to use one."

### Subsys

84.  Insys Pharmaceuticals is a Chandler, Arizona corporation.  Since 2012, it has sold Subsys, a highly potent pain medication.

85.  Subsys is the brand name for a form of the narcotic fentanyl.  The FDA approved the drug for cancer patients who receive sudden and intense pain that their regular pain medications cannot cover.  It is in the same class as Actiq, a highly potent pain medication that has been widely abused.

86.  Because of its high potency and potential for addiction, Subsys is governed by the Transmucosal Immediate Release Fentanyl ("TIRF") Risk Evaluation and Mitigation Strategy ("REMS") Access program.  Shortly after the FDA approved this program, Insys began commercializing Subsys on March 26, 2012.

87.  The TIRF-REMS program is designed to ensure informed risk-benefit decisions before initiating treatment and appropriate use of TIRF medicines.  Prescribing doctors must be certified by the TIRF-REMS program.  Certification requires that the doctor sign an enrollment form that states, in part: "I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent pain."

88.  In a report Insys filed with the U.S. Securities and Exchange Commission on April 19, 2013, in marketing Subsys, Insys "targeted [its] initial commercialization efforts towards the majority of these high prescribers" in the TIRF-REMS program. Of these doctors, only 1 percent were oncologists, and half were pain doctors, according to an article published by the New York Times on May 13, 2014.

89.  At the Ft. Myers pain clinic, Dr. Frey is a regular prescriber of Subsys to his patients.

18

90.     Brittney Williams, the pharmaceutical representative for Insys, has paid for Dr. Frey

to go on speaking engagements to talk about his experience with Subsys. The only

requirement for the speaking engagement is mentioning the drug once.

91.     For instance, on April 24, 2014, Dr. Frey, along with Dr. Daitch and his wife, and

Tom Zeller - owner of Advanced Physical Therapy & Rehabilitation, which receives

referrals from Drs Frey and Daitch and is located in the same building as Advanced

Pain in Cape Coral - was provided by Insys a lavish dinner at Cantina Laredo in Ft.

Myers. Afterward, Dr. Daitch reported that Ms. Williams was putting heavy pressure

and "really coming down hard" in her marketing.

### Other Kickback Sources

92.     A&G Spinal Solutions is a limited liability company incorporated in Florida and

headquartered at 8695 College Parkway, Suite 1195, Fort Myers, Florida. It is owned

by Ryan Williamson and William Pierce.

93.     In exchange for purchases of orthopedic devices - lumbar braces and cervical traction

collars - and other medical products, A&G Spinal regularly provides large kickbacks

to the clinic. Every few weeks, Mr. Williamson stops at the clinic to deliver an

envelope of cash to Dr. Frey. The envelope contains large amounts of $50 and $100

bills. One employee, Alex Barrios, told Ms. Oha that he overheard Dr. Frey telling

Ryan Williamson, "Do you have $6,400 cash?" and Williamson was then seen

leaving and coming back with two envelopes with cash.

94.     Mr. Williamson brought these envelopes to Dr. Frey on December 19, 2013. When

Relator Oha saw Mr. Williamson with his cash envelope on January 10, 2014, she

later saw the envelope, with a label from Suncoast Bank, sticking out of Dr. Frey's pocket, and took a photograph of the scene. (Exhibit B).

95.    Ms. Oha saw Mr. Williamson deliver envelopes on February 2, 2014, February 25, 2014, March 3, 2014, March 10, 2014 and March 12, 2014. After Mr. Williamson delivered a cash envelope on March 13, 2014, Dr. Frey told the staff he needed "to run to the bank."

96.    Mr. Williamson also delivered cash envelopes on April 2, 2014, April 10, 2014, and April 16, 2014.

97.    Gary Jusino, a sales representative from Jazz Pharmaceuticals provided free samples of Prialt to Advanced Pain, guised as a medical trial. On May 7, 2014, Advanced Pain used this free Prialt, Lot APL003A, with an expiration in January 2016, on patients, and billed to Medicare as if they purchased the drug, using CPT codes 77003 and 62311 for billing. Alex Barrios told Ms Oha that "they NEVER use anything else but a free sample for these procedures." Two other staffers were present.

98.    The Pain Clinic also uses free Botox samples, provided by Allergan and the company's sales reps Jodi Kuhl and Lisa Lemmon, for injections. As shown in Exhibit C, a patient anesthesia record is labeled: "Botox – use our own stock", and billed to Medicare as if they had purchased the drug. Krista Samuelson, RN told Mrs Oha that Advanced Pain gets samples, but the doctors "use them on patients and bill for them.....$1000/bottle."

99.    On April 10, 2014, Dr. Frey complained he felt like a "paid whore" for the pharmaceutical industry. The night before, he had attended an event at the Capital Grill in Naples paid by Depomed, a pain medication manufacturer. He also had a

paid "speaking engagement" on April 28, 2014, at 6:45 p.m, for Depomed at Opus, a top restaurant in Punta Gorda,with only one other physician in attendance, Dr. Louis Valente, a Port Charlotte pain specialist.

100. On November 11, 2013, Rebekah Pray, a referral relations representative from Radiology Regional - brought warm cinnamon rolls for the staff at Pain Center. At that time, she told Ms. Oha that Pain Center was now exclusively referring patients to her company now, because Florida Radiology Consultants decided not to "do anything for Frey" anymore.

101. On April 10, 2014, Dr. Frey told Ms. Oha that  he is not doing anyfurther business with Nucynta, after the company refused to furnish any further kickbacks.

**CLAIMS**

**False Claims Act**

**31 U.S.C. § 3729(a)(1)**

102. The Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-92.

103. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

104. Through the acts described above, the Defendants have (since at least 2013 if not earlier) knowingly presented, or caused to be presented, false or fraudulent claims, to the United States Government, in order to obtain reimbursement for services provided under Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

105.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT II

### False Claims Act

### 531 U.S.C. § 3729(a)(2)

106.    The Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-97.

107.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. 10108. Through the acts described above, the Defendants (since at least 2014) have knowingly made, used and caused to be made and used false records and statements to get false or fraudulent claims paid in order to obtain reimbursement for services provided under Medicare,Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

108.    As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT III

### False Claims Act

### 31 U.S.C. § 3729(a)(3)

109.    The Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-100.

110.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

111. Through the acts described above, the Defendants (since at least 2013) entered into agreements to defraud the United States by submitting false and fraudulent claims for reimbursement from the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program.

112. As a result of these false claims and this conspiracy, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT IV

### False Claims Act

### 331 U.S.C. § 3729(a)(7)

113. The Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-04.

114. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.

115. Through the acts described above, the Defendants (since at least 2014) knowingly failed to reimburse the Medicare, Medicaid, Tricare/Champus, and the Federal Employees Health Benefits Program for moneys wrongfully received.

116. As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT V

### Florida False Claims Act

117. The Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-108.

118.  This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081-68.092.

119.  Through the acts described above, the Defendants have (since at least 2013 if not earlier) knowingly presented, or caused to be presented, false or fraudulent claims, to the Florida Government, in order to obtain reimbursement for services provided under the Florida Medicaid Program and other health benefit programs.

120.  As a result of these false claims, the state of Florida has been damaged and continues to be damaged, in an amount yet to be determined.

## PRAYER

WHEREFORE, the Plaintiff prays for judgment against the Defendants as follows:

- that Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

- that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States and the state of Florida have sustained because of the Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 1729;

- that the Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

- that the Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and that the United States, the state of Florida and the Plaintiff recover such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff-relator Christine Oha hereby demands a trial by jury.

By and through her attorneys,


Dated:   June 10, 2015

Respectfully submitted,

James E. Felman, Esquire
Florida Bar No. 0775568
Katherine Earle Yanes, Esquire
Florida Bar No. 0159727
Kynes, Markman & Felman, P.A.
Post Office Box 3396
Tampa, FL  33601
(813) 229-1118
JFelman@kmf-law.com
KYanes@kmf-law.com

Timothy Cornell, Esquire
Massachusetts Bar No. 654412
Gardner & Cornell, P.C.
33 Mount Vernon Street
Boston, MA 02108
(603) 277-0838
TCornell@gardnercornell.com


*Attorneys for Relator*